AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>VAGAN ENGIBARIAN | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>19 MJ01486<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>APR 10 2019<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY          DEPUTY |

Complaint for violation of Title 21, United States Code, Section 841(a)(1)

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE STEVE KIM | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATES OF OFFENSES<br>April 9, 2019 | PLACE OF OFFENSE<br>Ventura County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. §§ 841(a)(1)]

On or about April 9, 2019, in Ventura County, within the Central District of California, defendant VAGAN ENGIBARIAN knowingly possessed with intent to distribute controlled substances.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:  N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**RENAE BROMLEY**    /S/<br><br>OFFICIAL TITLE<br>Special Agent – Federal Bureau of Investigation |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[(1)]<br><br>**STEVE KIM** | DATE<br>April 10, 2019 |
|---|---|

[(1)] See Federal Rules of Criminal Procedure 3 and 54

AUSA Claire E. Kelly x3868         REC: Detention

## AFFIDAVIT

I, Renae Bromley, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against VAGAN ENGABARIAN ("ENGABARIAN") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search four digital devices ("SUBJECT DEVICES 1-4," collectively, the "SUBJECT DEVICES"), in the custody of the Ventura County Sheriff's Office ("VCSO"), in Thousand Oaks, California, as described more fully in Attachment A.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth

all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.  I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), and have been so employed since September 2015. I am currently assigned to the Eurasian Organized Crime Task Force ("EOCTF") of the Los Angeles Field Office. The EOCTF is responsible for, among other things, investigating violations of federal law related to money laundering, narcotics and firearms trafficking, bank fraud, access device fraud, extortion, and health care fraud. Through my training, education and experience, I am familiar with the identification of controlled substances; the methods traffickers use to import, manufacture, and distribute controlled substances; the payment methods for buying and selling controlled substances; and the methods traffickers use to avoid law enforcement detection, including disguising the source and illegal nature of proceeds.

6.  I learned the information contained in this affidavit from, among other sources, information provided by VCSO Detective Stephen Egnatchik, who is in the Interagency Pharmaceutical Crimes Unit at VCSO, has been in law enforcement for 13 years, and is experienced in the investigation of crimes related to controlled substances.

### III. SUMMARY OF PROBABLE CAUSE

7. In January 2019, Aaron Smith ("Smith") went to U.S. Post Offices and a FedEx store to drop off three packages containing oxycodone and cocaine to be shipped from California to Connecticut. Those packages were seized by law enforcement. On Smith's cell phone, searched pursuant to a search warrant, law enforcement found texts and calls that Smith had recorded between himself and ENGABARIAN at 818-213-5671 ("ENGABARIAN's Phone"), in which ENGABARIAN arranged to sell Smith controlled substances.

8. On April 9, 2019, VCSO deputies followed location information for ENGABARIAN's Phone based on a ping warrant, and found and arrested ENGABARIAN for supplying Smith the oxycodone that Smith shipped to Connecticut. At the time of his arrest, ENGABARIAN had on him, among other things, a total of 31.9 gross grams of methamphetamine, 27 pills of oxycodone, a pay-owe sheet containing names, amounts paid, and quantities of drugs (including oxycodone) sold. The SUBJECT DEVICES were found with ENGABARIAN at the time of his arrest. In ENGABARIAN's car, VCSO deputies found hundreds of prescription pills, including 58 oxycodone pills.

### IV. STATEMENT OF PROBABLE CAUSE

**A. ENGABARIAN Provided Smith with Oxycodone that Smith Shipped to Connecticut**

9. Based on information obtained from VCSO Detective Egnatchik, I learned the following about the VCSO investigation of Smith and ENGABARIAN:

            a.   On or about January 16, 2019, VCSO deputies conducting surveillance on Smith in a related investigation saw Smith hand two padded envelopes to an employee at a United States Post Office in Van Nuys, California ("Package 1 and Package 2").

            b.   On or about January 23, 2019, a VCSO deputy notified Detective Egnatchik that Smith was at a FedEx Office in Studio City, California.  Detective Egnatchik spoke to a FedEx employee and arranged for the package that Smith had dropped off at that FedEx Office ("Package 3") be held for law enforcement to retrieve.

            c.   On or about January 25, 2019, law enforcement obtained a federal search warrant for Packages 1-3.  In Package 1, law enforcement found 199 small round blue pills marked "A 51," which, based on information received from Detective Egnatchik, I understand is a marking for oxycodone hydrochloride pills.  Two of the pills were tested by a forensic laboratory and found to contain oxycodone.  In Package 2, law enforcement found approximately 28.21 grams of cocaine, as confirmed by a forensic laboratory.  In Package 3, law enforcement found one plastic bag containing approximately 103 pills of three different colors and one plastic bag containing approximately 115 pills of four different colors.  The laboratory tested one pill of each color from each bag and determined that each of the seven tested pills contained oxycodone.

4

10. I learned from Detective Egnatchik that on or about March 11, 2019, law enforcement obtained a federal search warrant for Smith's phone that was seized from Smith at his arrest on February 7, 2019. Law enforcement had previously obtained a state search warrant for the same phone. According to Detective Egnatchik, Smith's phone contained a number of recordings that appeared to be calls that Smith had recorded. Among these recordings were calls between Smith and the intended recipient of Packages 1-3 in Connecticut.

11. Based on information from Detective Egnatchik, I understand that Smith's phone also included texts with ENGABARIAN's Phone and calls that Smith had recorded on his phone between Smith and ENGABARIAN's Phone reflecting that ENGABARIAN had provided the oxycodone to Smith that Smith tried to ship to Connecticut. These texts and calls include the following:

 a. January 14, 2019: Smith texted ENGABARIAN saying "Shipping ends at 5. In over here where r u at".

 b. January 20, 2019: Smith texted ENGABARIAN "Hey I have some bitcoin I can send you if you would like and get this straight G lmk Id like to see you". In subsequent text messages, ENGABARIAN texted Smith an electronic link that allowed Smith to pay ENGABARIAN with Bitcoin. Smith and ENGABARIAN discussed a location where they can meet up.

 c. January 22, 2019: ENGIBARIAN sent a text message to Smith containing an image of large quantity of blue pills

5

with "E8" marked on them. Detective Egnatchik viewed the image and believed the pills to be oxycodone.

       d.    January 31, 2019: Smith telephoned ENGABARIAN and Smith said he wanted to get working with ENGABARIAN again so he can have a source of supply to pay ENGABARIAN back money he owes. The conversation includes references to "blues" (a street name for oxycodone), "subs" (suboxone), and "Addys." Smith discusses another known drug broker who ENGABARIAN is selling to. They agree Smith will pay $22/pill to buy oxycodone pills from ENGABARIAN. Smith wants to make ENGABARIAN whole for the 200 pills ENGABARIAN fronted to Smith. Smith discussed his strategy for future shipments of drugs in the mail. During same call, Smith discusses how another person sold drugs that that person was holding for Smith. Smith discussed buying Norcos, "oxy 15's" and "oxy 20's" (street names for oxycodone) from ENGABARIAN.

       **B.    Arrest of ENGABARIAN with Methamphetamine, Prescription Pills, and the SUBJECT DEVICES**

12.    I learned the following about ENGABARIAN's arrest from information provided by Detective Egnatchik:

       a.    On or about April 9, 2019, following location data obtained pursuant to a state ping warrant for ENGABARIAN's Phone, VCSO Detectives went to a parking structure in Hollywood, California.

       b.    VCSO Detectives saw a car later determined to be used by ENGABARIAN ("ENGABARIAN's Car") in the parking structure and conducted surveillance. VCSO deputies saw ENGABARIAN

approach ENGABARIAN's Car with several suitcases. Detective Egnatchik instructed VCSO to arrest ENGABARIAN for a violation of California Health & Safety Code Section 11352(a) for providing Smith with the oxycodone Smith shipped to Connecticut.

   c. VCSO deputies arrested ENGABARIAN as he was loading items into ENGABARIAN's Car. As deputies approached ENGABARIAN, he was speaking on a cell phone (SUBJECT DEVICE 1), which was propped between his shoulder and ear. When ENGABARIAN saw the deputies, he dropped SUBJECT DEVICE 1.

   d. In a search incident to ENGABARIAN's arrest, VCSO deputies found on ENGABARIAN's person: one bag of methamphetamine with a gross weight of 11.2 grams, one bag of methamphetamine with a gross weight of 20.7 grams, one bag of heroin with a gross weight of 10.2 grams, approximately 27 oxycodone pills, and a pay-owe sheet containing names, amounts paid, and quantities of drugs sold. The drugs listed on the pay-owe sheet appeared to be Suboxone, Adderall, Morphine, Klonopin, oxycodone, and Norcos.

   e. VCSO deputies found SUBJECT DEVICE 2 in ENGABARIAN's pocket. Deputies found SUBJECT DEVICES 3 and 4 in a black satchel that ENGABARIAN was carrying on his shoulder.

   f. VCSO detectives searched ENGABARIAN's Car and found (in approximate quantities): 18 M30 oxycodone pills, 33 30mg (K9) oxycodone pills, 7 30 mg (E8) oxycodone pills, and hundreds of other prescription pills, including medication for the treatment of HIV. In the front driver's side door of ENGABARIAN's car, law enforcement found a syringe. Law

7

enforcement found another syringe next to an empty vial of testosterone, both of which were in a silver attaché case in the trunk of the car. Also found in the attaché case were 380 Vidalista (40 mg) pills; 20 Carisoprodal (350 mg) pills; and 1 fentanyl test strip.

      g.    On or about April 9, 2019, Detective Egnatchik and others interviewed ENGABARIAN. ENGABARIAN denied any involvement with drugs. As the complete report of that interview is still pending, I do not rely on his statements for probable cause.

### V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

13.    Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

      a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

      b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained

where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

      c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

      e. Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

14. As used herein, the term "digital device" includes the SUBJECT DEVICES.

15. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

16. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.  Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

17.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an

12

enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

   c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ENGABARIAN's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of ENGABARIAN's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

 18. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

## VII. CONCLUSION

19. For all of the reasons described above, there is probable cause to believe that ENGABARIAN has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

/s/
───────────────────────────
RENAE BROMLEY, Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this 10th day of April, 2019.

**STEVE KIM**
───────────────────────────
UNITED STATES MAGISTRATE JUDGE

14